1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**United States District Court**
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

DERRELL MORGAN ,                    )      No. C 10-03294 EJD (PR)
                                    )
          Petitioner,               )      **ORDER DENYING PETITION FOR**
                                    )      **WRIT OF HABEAS CORPUS;**
     vs.                            )      **DENYING CERTIFICATE OF**
                                    )      **APPEALABILITY**
                                    )
GARY SWARTHOUT, Warden,             )
                                    )
          Respondent.               )
                                    )
_____   )

          Petitioner has filed a <u>pro se</u> Petition for a Writ of Habeas Corpus under 28 U.S.C.

§ 2254 challenging a judgment of conviction from Alameda County Superior Court.

For the reasons set forth below, the Petition for a Writ of Habeas Corpus is **DENIED**.

**PROCEDURAL BACKGROUND**

          On September 26, 2006, a jury found Petitioner guilty of second degree murder.

Pet. at 1.  On November 17, 2006, the trial court sentenced Petitioner to a term of fifteen

years to life in state prison.  <u>Id.</u>

          On January 28, 2009, the state appellate court affirmed the judgment.  Resp. Ex. .

8.  On April 22, 2009, the California Supreme Court denied review.  Resp. Ex. 10.

Petitioner filed this instant petition for a writ of habeas corpus along with a motion to

stay and hold the federal proceedings in abeyance on June 27, 2010.  Thereafter,

Petitioner filed a state habeas petition in the California Supreme Court, which was ultimately denied on February 2, 2011.  Resp. Ex. 12.  On February 18, 2011, the Court granted Petitioner's motion to stay the petition.  Doc. No. 9.  On May 17, 2011, the Court granted Petitioner's motion to lift the stay, and re-opened the instant action.

## DISCUSSION

A.     Factual Background

The facts of Petitioner's underlying offenses were summarized in the state appellate court's opinion:

**Prosecution Case**

Cynthia Luttrell, a police officer with the Berkeley Police Department, was patrolling northwest Berkeley on the night of February 7, 2005. While talking with the owner of the Marina Liquor Store at University Avenue and Bonar Street, Luttrell observed three young Black men wearing dark clothing enter the store just before midnight.  She later learned their names were Jarell Johnson, Korey Usher and Lawrence Dillon.  The men purchased snacks, left the store, and walked across the street to the convenience shop at the Shell gas station.  About a half hour later, Luttrell saw the young men walking north on Sacramento Street, a few blocks from the liquor store.  They were joined by a fourth Black man of the same age group. She saw them turn right on Hearst Avenue, which is near Ohlone Park.

Lawrence Dillon testified that after leaving the stores, he, Johnson and Usher walked toward BART and lounged in the park, smoking and drinking, across the street from the station.  Dillon stated that Johnson walked back toward University Avenue to get something from the store and returned in "a little bit."  Johnson did not say anything to Dillon and Usher when he returned.  Dillon said, "[h]e just walked past us nonchalant."

Around 1:00 a.m. on February 8, 2005, Herbert Miller, a resident property manager at an apartment complex on University Avenue, heard a bottle break on the street and "stomping on the ground."  From his office window, he saw two figures wearing dark clothing kick something in the middle of the street.  They were on California Avenue, near an Out of the Closet thrift store, approximately 30 to 40 feet from the intersection with University Avenue.  They took turns kicking the side of the object, about three to four times each, "[n]ot in any kind of organized fashion, but just kind of back and forth, just kicking, winding up, a kicking, again winding up and kicking again."  Miller saw them begin to walk away, but one of the figures turned around, ran back, and jumped on the object with both feet.  They then walked toward Ohlone Park, two blocks away.  Miller was not sure the object was a body, but he had a "bad feeling" and called 9-1-1.

Berkeley police and paramedics responded to the emergency call. They found Maria King, a frail and unresponsive woman, lying in the middle of the street, with significant trauma to her face and head. She was transported to Highland Hospital where she was treated for multiple facial fractures and traumatic brain injury. Dr. Miriam Bullard, an attending physician at Highland, testified that King also had bruising to her anterior chest, facial swelling and lacerations to her scalp. King never regained consciousness and died almost two weeks later, on February 21, 2005.

Dr. Sharon Van Meter, a pathologist in Alameda County, performed King's autopsy on February 22, 2005. The autopsy showed that King had a number of small bruises on her body, but extensive injury to her head, including a skull fracture. Dr. Van Meter concluded that the cause of death was "[b]lunt trauma to the head. [¶] . . . [¶] . . . from multiple blows."

While emergency responders attended to King, the Berkeley Police Department dispatched several officers to search for suspects in the neighborhood. Officer Skylar Ramey detained two young men wearing dark clothing, Korey Usher and Lawrence Dillon, at the intersection of Hearst and California Avenues, on the south side of Ohlone Park. Officer Stanley Libed spotted a Black man in dark clothing, Johnson, near the intersection of Delaware and California Avenues, on the north side of Ohlone Park. Libed pulled directly in front of Johnson, stated he needed to speak with him, and then immediately handcuffed Johnson. Because of Johnson's "calm" demeanor, Libed did not think he was involved in the offense. Johnson said "something about getting off the 15 bus" and going to BART. Libed testified that he walked Johnson "back a few steps" to California Avenue and "gestured back towards University where we could see all the lights and everything else just to explain to him why I stopped him."

"Just on a whim," Libed used his flashlight to glance down at Johnson's feet because he was aware that the offense involved stomping or kicking. To his "great surprise," Libed saw blood on Johnson's shoe. Almost immediately after, Johnson gestured toward the police lights and stated, "I kicked some lady back there. She grabbed my hair."

Libed broadcast on the air that he had a detainee with blood on his shoe. Officer William Cocke responded to Libed's message and came to the site where Johnson was detained. In the presence of the officers, Johnson said, "I kicked her ass. She freaked out on me." Another officer brought eyewitness Herbert Miller for a field show-up. According to Libed, Miller stated that Johnson's clothing looked "very similar" to that of the dark figures he saw kicking the body. Subsequently, Libed verbally "Mirandized" Johnson. A few minutes later, Johnson stated, "I beat the shit out of her."

After a Berkeley police sergeant showed up, the officers

determined there was enough probable cause to arrest Johnson for the assault of King.  When Johnson asked about the charges, Libed responded that it would depend on the condition of the victim.  Libed transported Johnson to the Berkeley Police Department, re-Mirandized him using an admonition form, and took Johnson's statement.  The statement read: "'I'm really sorry it all happened.  I didn't mean for any of this to happen.  I really hope she's okay.  Around midnight I was walking west on University towards the BART station to go home.  I'd been drinking with some friends in Oakland, and I just got off the No. 15 bus. . . .' [¶] . . . [¶] 'I saw a bunch of stuff by the thrift store on University at California.  I went looking for some records in the pile.  I was hoping to find some Jimmie Hendrix or Bob Marley.  There was a homeless person on the sidewalk sleeping next to the pile and I tried not to disturb them. . . .' [¶] . . . [¶] 'I had to get pretty close to the person while looking through the box and suddenly the homeless lady reached for the box [and] said, "What the fuck?" and I slapped her hand away. . . .' [¶] . . . [¶] 'She then started screaming, grabbed my dreads, and pulled them.  She really freaked out.  I got scared, and I reacted to defend myself.  I studied martial arts. . . .' [¶] . . . [¶] 'And the training kicked in and I defensed [sic] myself on instinct.  I kicked her while she was on the ground twice.  And then I stopped.  I realized what had happened, that she was no longer a threat, and I stopped and walked away back towards BART.  As I was walking away, I realized what I had done.  And I started feeling really bad.  So when Officer Libed stopped me a little later I cooperated completely.  I'm really sorry.  I hope she's ok.'"

Libed testified that this statement was the first indication he had that Johnson had been drinking.  Libed did not investigate Johnson's sobriety level, and stated that he did not remember smelling alcohol on Johnson's breath.  After finishing the statement, Johnson asked Libed to return to the jail and tell him about the condition of the victim.

The following morning, Detective Lionel Dozier and Sergeant Howard Nonoguchi videotaped an interview with Johnson.  At trial, a redacted version of the video was played which eliminated all references to appellant.  In the video, Johnson confirmed that Officer Libed had read him his rights and that he understood those rights.  Johnson stated that he was drinking in Oakland with friends the night before and then took the No. 15 bus by himself to University Avenue.  He was walking down University when he saw some junk, boxes, clothes and a homeless lady.  He decided to look through the boxes for records, and explained, "I reached for a box BAM, I grabbed the box from where she was at, she tried to reach for it, and she, she said 'what the fuck' and she reached for the box and I knocked her hand away and she probably grabbed my collar . . . and she grabbed my hair . . . and I beat the shit out of her, man."

Johnson described the attack further, stating, "[I] punched her like first she had my hair – BAM – she tried to run from me, I BAM, I gave her another one, I kicked her in her head like three

times," and "she was like 'what the fuck,' I'm like 'Bitch, watch out,' . . . she tried to grab my collar . . . BAM, 'Bitch, get the fuck off me, yo.' [¶] . . . [¶]  Hit her in her jaw like twice, like BAM, BAM, I gave her like some uppercuts, BAM, BAM. And then she let me go, she tried to run in the street, I'm, she was running, she was turned around, I BAM."

The parties stipulated that Johnson never indicated that he went back and stomped on the body with both feet.  The court also informed the jury of another stipulation by all parties "that at three different places in the interview in response to questions, the defendant Mr. Johnson told the detectives 'I was by myself.'"

Detective Robert Rittenhouse testified that, on March 29, 2005, he and his partner met with Christon Parker, who was in custody at Santa Rita County Jail for burglary, after being told that Parker had information related to the attack on Maria King. Parker told Rittenhouse that he knew who the second person was who had taken part in the attack because that person had told him about it.  Parker said he did not want to give the name while he was in jail because the person would know who had snitched, and Parker was afraid he would be killed. Parker also said Johnson would never name the other attacker because "they [were] like brothers."

On April 29, 2005, Rittenhouse returned to Santa Rita County Jail after learning that Parker wanted to talk to him and his partner again.  During this interview, Parker told the detectives that he was driving with appellant the day after the attack and, as they passed California and University Avenue – where the attack occurred – appellant said, "You know that's where we went dumb on that woman.  That's where we beat her up.  That's where it happened."  Parker asked the detectives about whether he might get "some consideration" for helping the police, and Rittenhouse said he would let the district attorney know that Parker had been cooperative.

At a third interview on May 6, 2005, Parker reiterated what appellant had told him as they drove past the scene of the attack. When Rittenhouse asked what "going dumb" was, Parker said it meant "to beat, stomp, kick."  Rittenhouse thereafter called the deputy district attorney handling Parker's burglary case and told him that Parker had cooperated with police.

Parker had testified earlier in the trial that he and appellant were associates and hung out together, maybe a couple of times a week.  He had driven past the crime scene with his father and then with friends, but not with appellant.  Parker said he never spoke with appellant after the attack and appellant never said he "went dumb" on King.  When Parker told the police that appellant was involved in the attack, he had gotten this information from "somebody," not from appellant.  Parker acknowledged he was in custody for ignoring a subpoena to testify in this case.  He denied that he was scared; he just did not want to be a snitch.  When asked if he talked to the officers about the attack in hopes of

getting a deal on his own case, Parker responded, "Not really." He said he was never made any promises and did not get any deal.

Lawrence Dillon's ex-girlfriend, Sashay Long, also testified about what Dillon had told her regarding the identity of the attackers. The day after the attack, Dillon first jokingly told Long that he had "stomped that bitch." When she said that "wasn't funny," he got serious and told her that, the night before, appellant and Johnson had walked past him. They were "giggling," but would not tell Dillon why they were laughing. Dillon then told Long that appellant told him that he and Johnson "ran into an old white lady" with a box. They were trying to rob her and Johnson grabbed the box. The woman grabbed Johnson and Johnson "took off on the lady." After they left, appellant said, "Let's go back and kill this bitch," so they went back and beat her again.

Some time later, Dillon and Long saw appellant at a liquor store. Dillon said, "What's up with that," and appellant dropped the liquor bottle he was holding. Just after that encounter, Dillon commented on appellant dropping the bottle because he was nervous.

Long eventually went to the police with the information that Dillon had given her because "it ate me up that I knew someone died and then I knew who did it." She did not use her real name when she told the police what she knew because she was scared, having been "taught not to snitch," although her real name eventually came out. She asked the police about the reward while she was there, but the police said she would have to testify, "and I didn't want to. I didn't want anything to do with it after that."

Long then moved out of state without telling the police where she was going. She was later contacted by someone in the district attorney's office and flew back to testify. She was not in court voluntarily; she was scared to come back to California.

During his testimony earlier in the trial, Dillon had denied that appellant ever said anything about being involved in the attack. Dillon had also denied discussing the attack with Long, and said he had never joked with her about being involved in the attack himself.

DNA analysis of the blood on Johnson's shoe was "consistent" with a blood sample taken from Maria King. There was a one in 990 billion chance among Caucasians, one in 2.2 trillion chance among African-Americans, and one in 7.6 trillion chance among Hispanics that an unrelated individual would have had the same DNA profile as the blood found on Johnson's shoe.

The prosecution also introduced evidence of a prior similar incident between Johnson and a homeless person. Maurice Thompson testified that, in 2003, a man smashed a bottle on his head while he was sleeping on the sidewalk with other homeless

people.  Thompson identified Johnson as the attacker.  [FN2]  As Thompson chased after Johnson, Johnson and his friend continued to throw more bottles and garbage until they were all detained by police officers near the scene.  Thompson recalled that when Johnson was sitting in the police car waiting to be transported, he was "still smiling and laughing" at Thompson.

> FN2.  The two young men detained for the attack on Thompson were Johnson and Korey Usher.  Officer Kenneth McKellar of the Oakland Police Department took Thompson's statement on the night of the incident.  The statement identified Usher as the man who broke the bottle over Thompson's head.

**Defense Case**

The victim, Maria King, a homeless woman living on the street for many years, had "mental problems" and was arrested on various occasions for trespassing or public drunkenness.  On one occasion in May 2004, she resisted arrest by flailing, kicking and using foul and discriminatory language.  She kicked the window of a patrol car and an officer's kneecap.

Charles Davis testified that he met appellant at about 6:00 p.m. on the night of the attack.  They drank alcohol together for about 45 to 50 minutes, and then Davis dropped appellant off at his home.  Appellant's mother, brother, and second cousin all testified that appellant arrived home that evening at about 8:00 or 9:00 p.m., and that he was intoxicated.  None of them had told the police that appellant was at home that evening. They had only told appellant's attorney.  [FN3]

> FN3. Appellant's mother had previously pleaded guilty to welfare fraud; appellant's brother had previously admitted committing an assault with great bodily injury; and appellant's cousin, as a juvenile, had been in trouble for trying to cash a stolen check and for possession of marijuana.

Dan Mahomes, who had known appellant all his life, testified that, on the night of the attack, he was with appellant at a liquor store at Bancroft and San Pablo Avenues in Berkeley between approximately 10:00 and 11:00 p.m.  Johnson was also there.

**Rebuttal**

Johnson punched a fellow inmate, John Ellwanger, at Santa Rita Jail on September 3, 2006, during the course of the trial.  Ellwanger had joked that it sounded like Johnson and his cellmate were having sex.  Johnson hit Ellwanger more than once.  Ellwanger required seven stitches, but did not file a complaint.

People v. Morgan, A115939, 2009 WL 191000, at *1-*5 (Cal. Ct. App. Jan. 28, 2009).

United States District Court
For the Northern District of California

1    Resp. Ex. 8 at 2-9.

2    B.    Standard of Review

3        This Court may entertain a petition for a writ of habeas corpus "in behalf of a

4    person in custody pursuant to the judgment of a State court only on the ground that he is

5    in custody in violation of the Constitution or laws or treaties of the United States."  28

6    U.S.C. § 2254(a).  The writ may not be granted with respect to any claim that was

7    adjudicated on the merits in state court unless the state court's adjudication of the claim:

8    "(1) resulted in a decision that was contrary to, or involved an unreasonable application

9    of, clearly established Federal law, as determined by the Supreme Court of the United

10   States; or (2) resulted in a decision that was based on an unreasonable determination of

11   the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. §

12   2254(d).

13       "Under the 'contrary to' clause, a federal habeas court may grant the writ if the

14   state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

15   question of law or if the state court decides a case differently than [the] Court has on a

16   set of materially indistinguishable facts."  Williams v. Taylor, 529 U.S. 362, 412–13

17   (2000).  The only definitive source of clearly established federal law under 28 U.S.C. §

18   2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time

19   of the state court decision.  Williams, 529 U.S. at 412; Brewer v. Hall, 378 F.3d 952,

20   955 (9th Cir. 2004).  While circuit law may be "persuasive authority" for purposes of

21   determining whether a state court decision is an unreasonable application of Supreme

22   Court precedent, only the Supreme Court's holdings are binding on the state courts and

23   only those holdings need be "reasonably" applied.  Clark v. Murphy, 331 F.3d 1062,

24   1069 (9th Cir.), overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63 (2003).

25       "Under the 'unreasonable application' clause, a federal habeas court may grant

26   the writ if the state court identifies the correct governing legal principle from [the

27   Supreme Court's] decisions but unreasonably applies that principle to the facts of the

28   prisoner's case."  Williams, 529 U.S. at 413.  "Under § 2254(d)(1)'s 'unreasonable

*United States District Court*
For the Northern District of California

application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.  The federal habeas court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

The state court decision to which Section 2254(d) applies is the "last reasoned decision" of the state court.  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92 (9th Cir. 2005).  When there is no reasoned opinion from the highest state court considering a petitioner's claims, the court "looks through" to the last reasoned opinion.  See Ylst, 501 U.S. at 805; Shackleford v. Hubbard, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000).  Where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, an independent review of the record is the only means of deciding whether the state court's decision was objectively reasonable.  See Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

Recently, the Supreme Court vigorously and repeatedly affirmed that under AEDPA, there is a heightened level of deference a federal habeas court must give to state court decisions.  See Hardy v. Cross, 132 S. Ct. 490, 491 (2011) (per curiam); Harrington v. Richter, 131 S. Ct. 770, 783-85 (2011); Premo v. Moore, 131 S. Ct. 733, 739-40 (2011); Felkner v. Jackson, 131 S. Ct. 1305 (2011) (per curiam).  As the Court explained:  "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'"  Id. at 1307 (citation omitted).  With these principles in mind regarding the standard and limited scope of review in which this Court may engage in federal habeas proceedings, the Court addresses Petitioner's claims.

United States District Court
For the Northern District of California

C.    Claims and Analysis

Petitioner raises the following grounds for federal habeas relief:  (1) there was insufficient evidence to convict him of second degree murder; (2) the trial court's failure to sever Petitioner's trial resulted in a fundamentally unfair trial; (3) admission of Johnson's prior bad acts violated Petitioner's right to due process; (4) admission of Sashay Long's testimony violated Petitioner's right to due process; and (5) trial counsel rendered ineffective assistance for failure to investigate and prepare defense witness Dan Mahomes.  Each claim is analyzed in turn below.

1.    Sufficiency of the evidence

Petitioner claims that the evidence was insufficient to sustain a conviction of second degree murder.  Specifically, Petitioner asserts that the only evidence implicating his involvement in the crime were the hearsay testimonies from Long about Dillon's statements and from Sergeant Rittenhouse regarding what Parker had said to him – both of which were later recanted by both Parker and Long, and evidence of Petitioner's friendship with Johnson.

The state appellate court rejected this claim.  It stated that the "hearsay" testimony was admissible under state law, and that it was the jury's job to determine credibility of the witnesses.  Resp. Ex. 8 at 11.  Despite Parker and Long's incentive to lie, the state appellate court concluded that it was the role of the jury to decide how much weight to give the properly admitted statements.  Id.  The state appellate court found that Parker and Long's statements implicating Petitioner, combined with Dan Mahomes' testimony, placing Petitioner near the crime scene on the night of the murder, were sufficient evidence to sustain Petitioner's conviction.  Id. at 11-12.

A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992).  Nor does a federal habeas court in general question a jury's credibility determinations, which are entitled to near-total deference.  Jackson v. Virginia, 443 U.S. 307, 326 (1979).  The federal court determines

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    only whether, "after viewing the evidence in the light most favorable to the prosecution,

2    any rational trier of fact could have found the essential elements of the crime beyond a

3    reasonable doubt." Id. at 319.  Only if no rational trier of fact could have found proof of

4    guilt beyond a reasonable doubt, may the writ be granted. Id. at 324.  "[T]he only

5    question under Jackson is whether that [jury] finding was so insupportable as to fall

6    below the threshold of bare rationality."  Coleman v. Johnson, 132 S. Ct. 2060, 2065

7    (2012).

8          In California, second degree murder is the unlawful killing of a human being

9    with malice aforethought, but without willfulness, premeditation, and deliberation.  See

10   Cal. Pen. Code §§ 187, 189.  "Such malice may be express or implied.  It is express

11   when there is manifested a deliberate intention unlawfully to take away the life of a

12   fellow creature.  It is implied, when no considerable provocation appears, or when the

13   circumstances attending the killing show an abandoned and malignant heart.  When it is

14   shown that the killing resulted from the intentional doing of an act with express or

15   implied malice as defined above, no other mental state need be shown to establish the

16   mental state of malice aforethought."  Cal. Pen. Code § 188.  Express and implied

17   malice "may be inferred from the circumstances of the homicide."  People v. Lines, 13

18   Cal.3d 500, 505 (1975).

19         Here, the evidence showed that the witness, Herbert Miller, saw two people

20   taking turns repeatedly kicking an object and then, before finally leaving, jumped on the

21   object with both feet; Petitioner was with Dan Mahomes near the time and place of the

22   crime; Petitioner showed Parker where he "went dumb on that woman" and beat her up;

23   and Petitioner told Dillon that he and Johnson were trying to rob "an old white lady,"

24   and beat her up.  Viewing the evidence in the light most favorable to the prosecution, a

25   rational trier of fact could have found Petitioner guilty of second degree murder beyond

26   a reasonable doubt.  On such a record, Petitioner's claim that the state court's

27   conclusion was contrary to, or an unreasonable application of, Jackson is DENIED.

28

United States District Court

For the Northern District of California

2.      Joint Trial

Petitioner claims that the trial court's denial of his motion to sever the trial was fundamentally unfair because he was prejudiced by the overwhelming evidence against Johnson.  Petitioner argues that the joint trial allowed the jury to convict him in part because of his association with Johnson, and the strong evidence against Johnson bolstered the prosecution's weak case against Petitioner.

Relying on state law, the state appellate court denied this claim.  It concluded that, although the evidence against Johnson was much stronger, the prosecution had independent evidence of guilt against Petitioner, and the trial court carefully tailored limiting instructions to cure the risk of prejudice that any verdict against Petitioner would be tainted by evidence of Johnson's statements and prior bad acts.  Resp. Ex. 8 at 14-18.

A denial of severance of co-defendants may prejudice a defendant sufficiently to render his trial fundamentally unfair in violation of due process.  Grisby v. Blodgett, 130 F.3d 365, 370 (9th Cir. 1997).  A federal court reviewing a state conviction under 28 U.S.C. § 2254 does not concern itself with state law governing severance or joinder in state trials.  Id.  Its inquiry is limited to the petitioner's right to a fair trial under the United States Constitution.  Id.  To prevail, therefore, the petitioner must demonstrate that the state court's joinder or denial of his severance motion resulted in prejudice great enough to render his trial fundamentally unfair.  Id.  In addition, the impermissible joinder must have had a substantial and injurious effect or influence in determining the jury's verdict.  Sandoval v. Calderon, 241 F.3d 765, 772 (9th Cir. 2000).

As an initial matter, "there is no clearly established federal law requiring severance of criminal trials in state court even when the defendants assert mutually antagonistic defenses."  Runningeagle v. Ryan, 686 F.3d 758, 777 (9th Cir. 2012) (rejecting ineffective assistance of counsel claim premised on counsel's failure to join co-defendant's motion to sever);  Collins v. Runnels, 603 F.3d 1127, 1132-33 (9th Cir. 2010).  Thus the state court's decision could not be contrary, or an unreasonable

United States District Court

For the Northern District of California

1  application of, any clearly established Supreme Court law regarding the propriety of a

2  severance.  See Carey v. Musladin, 549 U.S. 70, 77 (2006) (where Supreme Court

3  precedent gives no clear answer to question presented, "it cannot be said that the state

4  court 'unreasonab[ly] appli[ed] clearly established Federal law'"); Brewer v. Hall, 378

5  F.3d 952, 955 (9th Cir. 2004) ("If no Supreme Court precedent creates clearly

6  established federal law relating to the legal issue the habeas petitioner raised in state

7  court, the state court's decision cannot be contrary to or an unreasonable application of

8  clearly established federal law.").

9       Alternatively, the trial against Petitioner was not fundamentally unfair.

10  Johnson's defense was one of state of mind, while Petitioner's defense was one of

11  identity.  In addition, the trial court's limiting instruction clarified to the jury that

12  Johnson's prior bad acts and prior statements should be attributable only to Johnson.

13  See Bean v. Calderon, 163 F.3d 1073, 1085-86 (9th Cir. 1998) (recognizing that  joinder

14  generally does not result in prejudice if the jury is properly instructed so that it may

15  compartmentalize the evidence).  Petitioner has not demonstrated that the denial of his

16  motion to sever had a substantial or injurious effect on the jury's verdict, and this claim

17  is DENIED.

18       3.     Prior bad acts

19       Petitioner claims that the trial court's admission of Johnson's prior bad acts, i.e.,

20  his attack on a homeless person and attack on another jail inmate, as well as his laughter

21  in response to the assault of a homeless man, prejudiced Petitioner and violated his right

22  to due process.  Petitioner argues that the evidence merely allowed the prosecutor to

23  paint Johnson as a vicious monster, and did nothing to assist the jury in determining

24  Petitioner's guilt.

25       The state appellate court found that the evidence was admitted to show Johnson's

26  intent and character for violence, and agreed with Petitioner that Johnson's prior bad

27  acts was irrelevant to Petitioner.  Further, the instructions explained to the jury that the

28  evidence was admitted solely against Johnson, and only for the limited purpose

United States District Court

For the Northern District of California

1   explained in the instructions.  Resp. Ex. 8 at 20-21.  Thus, explained the state appellate

2   court, Petitioner could not demonstrate that he was prejudiced by admission of the

3   evidence.  Id. at 21.

4        The admission of evidence is not subject to federal habeas review unless a

5   specific constitutional guarantee is violated or the error is of such magnitude that the

6   result is a denial of the fundamentally fair trial guaranteed by due process.  See Henry v.

7   Kernan, 197 F.3d 1021, 1031 (9th Cir. 1999).  The Supreme Court "has not yet made a

8   clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due

9   process violation sufficient to warrant issuance of the writ."  Holley v. Yarborough, 568

10  F.3d 1091, 1101 (9th Cir. 2009) (finding that trial court's admission of irrelevant

11  pornographic materials was "fundamentally unfair" under Ninth Circuit precedent but

12  not contrary to, or an unreasonable application of, clearly established Federal law under

13  § 2254(d)). The United States Supreme Court has left open the question of whether

14  admission of propensity evidence violates due process.  Estelle v. McGuire, 502 U.S.

15  62, 75 n. 5 (1991).  Based on the Supreme Court's reservation of this issue as an "open

16  question," the Ninth Circuit has held that a petitioner's due process right concerning the

17  admission of propensity evidence is not clearly established as required by AEDPA.

18  Alberni v. McDaniel, 458 F.3d 860, 866-67 (9th Cir. 2006).  Here, because the Supreme

19  Court has expressly reserved the question of whether using evidence of prior crimes to

20  show propensity for criminal activity could ever violate due process, the state court's

21  rejection of this claim did not unreasonably apply clearly established federal law.  See

22  Larson v. Palmateer, 515 F.3d 1057, 1066 (9th Cir. 2008).

23       Alternatively, Petitioner cannot demonstrate that admission of Johnson's prior

24  bad acts prejudiced him.  As the record shows, the trial court specifically instructed the

25  jury that the evidence of Johnson's prior bad acts was admitted only as to Johnson, and

26  that it could not be used against Petitioner.  The jury was also instructed as to the

27  limited purpose that it could consider that evidence.  Juries are presumed to follow a

28  court's limiting instructions with respect to the purposes for which evidence is admitted.

1   Aguilar v. Alexander, 125 F.3d 815, 820 (9th Cir. 1997).  Petitioner has not presented

2   any evidence that the jury did not follow the court's instructions.  Thus, Petitioner is not

3   entitled to habeas relief on this claim.

4          4.      Sashay Long's testimony

5          Petitioner claims that his right to due process was violated when prosecution

6   witness Sashay Long was permitted to testify that her boyfriend, Lawrence Dillon, told

7   her that Petitioner admitted his involvement to him.  Petitioner argues that not only were

8   the statements inadmissible hearsay pursuant to state law, but they were also unreliable

9   and prejudicial.

10          The state appellate court denied this claim.  It found that Long's statement was

11   properly admitted under exceptions to the hearsay rule – one as a party admission and

12   the other as a prior inconsistent statement.  Resp. Ex. 8 at 22-23.  As to Petitioner's

13   constitutional claim, the state appellate court found that the admission did not render the

14   trial fundamentally unfair.

> Appellant nonetheless avers that admission of Long's
> hearsay testimony rendered his trial fundamentally unfair, in
> violation of due process, because both Long and Dillon had
> strong motivations to lie.  However, both witnesses were
> cross-examined thoroughly.  The jury heard evidence that, when
> she approached the police with her information, Long was
> pregnant and asked about the $15,000 in reward money.  The jury
> also heard evidence implying that Dillon could have fabricated
> his comments to Long to protect himself from suspicion that he
> might have been the second, unknown assailant in the attack.
> Long's testimony was admissible, and it was for the jury to
> determine her credibility.  (See People v. Zapien, supra, 4 Cal.4th
> at pp. 951-952, 956; People v. Barnes, supra, 42 Cal.3d at pp.
> 303-304, 306.)

22   Id. at 23.

23          As stated above, the admission of evidence is only subject to federal habeas

24   review if a specific constitutional guarantee is violated or the error is of such magnitude

25   that it results in a fundamentally unfair trial.  See Henry, 197 F.3d at 1301.  A writ of

26   habeas corpus will be granted for an erroneous admission of evidence "only where the

27   'testimony is almost entirely unreliable and . . . the factfinder and the adversary system

28

United States District Court
For the Northern District of California

1    will not be competent to uncover, recognize, and take due account of its

2    shortcomings.'" Mancuso v. Olivarez, 292 F.3d 939, 956 (9th Cir. 2002) (quoting

3    Barefoot v. Estelle, 463 U.S. 880, 899 (1983)).  Admission of evidence violates due

4    process only if "there are no permissible inferences the jury may draw from the

5    evidence." Jammal, 926 F.2d at 920. "Even then, the evidence must 'be of such quality

6    as necessarily prevents a fair trial.'" Id. (quoting Kealohapauole v. Shimoda, 800 F.2d

7    1463 (9th Cir. 1986)).

8            Moreover, as the Ninth Circuit has observed:

9            The Supreme Court has made very few rulings regarding the
             admission of evidence as a violation of due process.  Although the
10           Court has been clear that a writ should be issued when
             constitutional errors have rendered the trial fundamentally unfair
11           (citation omitted), it has not yet made a clear ruling that admission
             of irrelevant or overtly prejudicial evidence constitutes a due
12           process violation sufficient to warrant issuance of the writ.

13   Holley, 568 F.3d at 1101.  Therefore, "under AEDPA, even clearly erroneous

14   admissions of evidence that render a trial fundamentally unfair may not permit the grant

15   of federal habeas corpus relief if not forbidden by 'clearly established Federal law,' as

16   laid out by the Supreme Court." Id.  Applying these legal principles here, the state

17   court's rejection of Petitioner's due process claim does not support Petitioner's request

18   for federal habeas relief under AEDPA because the admission of Long's testimony did

19   not violate any clearly established federal law.  Id.

20           Nonetheless, the state appellate court acknowledged that both Long and Dillon

21   later recanted their statements.  However, both witnesses were thoroughly

22   cross-examined, and the jury heard evidence regarding their motivations to lie.  The

23   record demonstrates that the jury considered, and rejected, Petitioner's argument that

24   the statements of both Long and Dillon implicating Petitioner were fabricated.  Thus,

25   Petitioner is not entitled to habeas relief on this claim.

26           5.      Ineffective Assistance of Counsel

27           At trial, defense counsel called four defense witnesses who testified that

28   Petitioner was at home the night of the murder.  Charles Davis testified that he was with

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    Petitioner on the night of murder around 5:30 or 6 p.m., and drank with him for about

2    45-50 minutes, and then left.  RT 1905-12.  Petitioner's mother, Robbie Morgan,

3    testified that Petitioner came home on February 2, 2006[1] around 8:30 or 9 p.m.  RT

4    1760.  She testified that she could tell Petitioner had been drinking.  RT 1761.  She did

5    not recall what time Petitioner came home on any other days around February 2, 2006.

6    RT 1762.  She checked on Petitioner around 11:00 p.m. the night of February 2, 2006,

7    and he was sleeping.  RT 1763.  LaMarr Morgan testified that Petitioner got home the

8    night of the murder around 8 p.m. and Petitioner passed out from drinking.  RT 1802.

9    As far as LaMarr  Morgan knew, Petitioner did not go anywhere that night.  RT 1803.

10   Parisa Daily testified that the crime occurred on a Friday, and she arrived at Petitioner's

11   house that night around 9:30 or 10:30 p.m. to smoke marijuana with him.  RT 1831-35.

12   When Daily found Petitioner, he had already passed out from drinking.  RT 1836.

13   Daily stayed awake until around 1 a.m.  RT 1831-35.

14          Defense counsel also called Mahomes to the stand to rebut Parker's testimony

15   that Petitioner was with Parker when he drove by the crime scene, and admitted he

16   "went dumb on that woman."  Pet. App. Ex. C.  Mahomes testified that a day or two

17   after the murder, Mahomes got into a van with Christon Parker.  Id. at 1784.  The driver

18   took Mahomes and his friends to the scene of the crime and told them that "somebody

19   got beat up over here."  Id.  Mahomes testified that Petitioner was not with them in the

20   van.  Id. at 1785.  On cross-examination, the prosecutor elicited testimony that

21   Mahomes was with Petitioner and Johnson two or three hours prior to the homicide, and

22   within a mile of the crime scene, id. at 1786-87, contradicting several other defense

23   witnesses who testified that Petitioner was at home the night of the crime, passed out

24   from drinking.

25          Petitioner claims that counsel rendered ineffective assistance for failing to

26   adequately investigate and prepare defense witness Dan Mahomes.  Petitioner argues

27

28          [1] The crime occurred on February 7-8, 2006, Resp. Ex. 8 at 2, which are Monday
        and Tuesday, RT 1896-98.

United States District Court

For the Northern District of California

1    that, had counsel properly investigated and prepared Mahomes, counsel would have

2    learned that Mahomes was with Petitioner and Johnson two or three hours prior to the

3    homicide, and within a mile of the crime scene.  Pet. App. Ex. G ("Decl. Pyle") at ¶ 7.

4         The California Supreme Court denied this claim without opinion.  Thus, this

5    Court must conduct an "independent review of the record" to determine whether the

6    state court's decision was an objectively unreasonable application of clearly established

7    federal law.  See Plascencia v. Alameida, 467 F.3d 1190, 1197-98 (9th Cir. 2006).

8         In order to prevail on a Sixth Amendment ineffectiveness of counsel claim,

9    petitioner must establish two things.  First, he must establish that counsel's performance

10   was deficient, i.e., that it fell below an "objective standard of reasonableness" under

11   prevailing professional norms.  Strickland v. Washington, 466 U.S. 668, 687-88 (1984).

12   Second, he must establish that he was prejudiced by counsel's deficient performance,

13   i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors,

14   the result of the proceeding would have been different."  Id. at 694.

15        The Strickland framework for analyzing ineffective assistance of counsel claims

16   is considered to be "clearly established Federal law, as determined by the Supreme

17   Court of the United States" for the purposes of 28 U.S.C. § 2254(d) analysis.  See

18   Cullen v. Pinholster, 131 S. Ct. 1388, 1403 (2011).  A "doubly" deferential judicial

19   review is appropriate in analyzing ineffective assistance of counsel claims under § 2254.

20   See id. at 1410-11.  The general rule of Strickland, i.e., to review a defense counsel's

21   effectiveness with great deference, gives the state courts greater leeway in reasonably

22   applying that rule, which in turn "translates to a narrower range of decisions that are

23   objectively unreasonable under AEDPA."  Cheney v. Washington, 614 F.3d 987, 995

24   (9th Cir. 2010) (citing Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)).  When

25   § 2254(d) applies, "the question is not whether counsel's actions were reasonable.  The

26   question is whether there is any reasonable argument that counsel satisfied Strickland's

27   deferential standard."  Harrington v. Richter, 131 S. Ct. 770, 788 (2011).

28        A defense attorney has a general duty to make reasonable investigations or to

1    make a reasonable decision that makes particular investigations unnecessary.  See

2    Strickland, 466 U.S. at 691; Pinholster, 131 S. Ct. at 1407.  Strickland directs that "'a

3    particular decision not to investigate must be directly assessed for reasonableness in all

4    the circumstances, applying a heavy measure of deference to counsel's judgments.'"

5    Silva v. Woodford, 279 F.3d 825, 836 (9th Cir. 2002) (quoting Strickland, 466 U.S. at

6    491).  Counsel need not pursue an investigation that would be fruitless or might be

7    harmful to the defense.  See Harrington, 131 S. Ct. at 789-90.

8          Here, Petitioner provides a declaration from counsel stating that, had he known

9    that Mahomes would testify that he was with Petitioner and Johnson just hours before

10   the murder in an area not far from the crime, counsel would have never called Mahomes

11   to the stand given the defense theory of misidentification and the defense witnesses who

12   had testified that Petitioner was at home all night.  Decl. Pyle at ¶ 7.  Counsel declared

13   that he does not remember personally interviewing Mahomes, and called Mahomes to

14   testify solely to corroborate Parker's recanted testimony that Petitioner was never in the

15   van with Parker when he drove by the crime scene the following day.  Id. at ¶¶ 2, 4-6.

16         Nonetheless, the mere fact that counsel cannot recall the tactical basis for his or

17   her decisions does not rebut the presumption that counsel acted reasonably.  Alcala v.

18   Woodford, 334 F.3d 862, 870-71 (9th Cir. 2003).  "[C]ounsel has a duty to make

19   reasonable investigations or to make a reasonable decision that makes particular

20   investigations unnecessary."  Strickland, 466 U.S. at 691.

21         Here, even assuming that counsel did not personally interview Mohames, given

22   that the defense theory was alibi, and defense witnesses were prepared to testify that

23   Petitioner was asleep at home at the time of the murder, it was reasonable for counsel to

24   decide that further investigation or preparation of Mohames was unnecessary.  See

25   Harrington, 131 S. Ct. at 791 ("an attorney may not be faulted for a reasonable

26   miscalculation or lack of foresight or for failing to prepare for what appear to be remote

27   possibilities").  Even if counsel had further probed Mohames, he may not have

28   discovered that Mohames was with Petitioner the night of the murder because there was

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
N:\Pro - Se & Death Penalty Orders\Novemeber 2012\10-03294Morgan03294_deny petition-coa.wpd

19

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

no reason for counsel to suspect or question that Petitioner was anywhere close to the murder.  See Silva v. Woodford, 279 F.3d 825, 836 (9th Cir. 2002) ("a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments") (internal quotation omitted); cf. Reynoso v. Giurbino, 462 F.3d 1099, 1112 (9th Cir. 2006) (finding that defense counsel's failure to investigate further and question two trial witnesses when she had either "direct or specific knowledge of their awareness of the reward" for their testimony at trial constitutes deficient performance).  Thus, indulging the strong presumption that counsel "made all significant decisions in the exercise of reasonable professional judgment," Strickland, 466 U.S. at 689-690, and cognizant of the doubly deferential standard § 2254 adds to this claim, this Court concludes that the state court's denial of Petitioner's ineffective assistance of counsel claim was reasonable.

### CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition for a Writ of Habeas Corpus must be **DENIED**.

Further, a Certificate of Appealability is **DENIED**.  Petitioner has not made "a substantial showing of the denial of a constitutional right" 28 U.S.C. § 2253(c)(2), nor has he demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).  Petitioner may seek a certificate from the Court of Appeals under Federal Rule of Appellate Procedure 22.  See Rule 11(a) of the Rules Governing Section 2254 Cases.

The clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

SO ORDERED.

DATED:      11/2/2012



EDWARD J. DAVILA
United States District Judge

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA

DERRELL MORGAN,

        Plaintiff,

  v.

GARY SWARTHOUT et al,

        Defendant.

_____/

Case Number: CV10-03294 EJD

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on November 2, 2012, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Derrell Morgan F52008
CTF - North RA 124-U
P. O. Box 705
Soledad, CA 93960

Dated: November 2, 2012

Richard W. Wieking, Clerk
/s/ By: Elizabeth Garcia, Deputy Clerk

Order Denying Petition for Writ of Habeas Corpus; Denying Certificate of Appealability
N:\Pro - Se & Death Penalty Orders\Novemeber 2012\10-03294Morgan03294_deny petition-coa.wpd